```
                                    _____ FILED        _____ RECEIVED
                                    _____ ENTERED      _____ SERVED ON
                                              COUNSEL/PARTIES OF RECORD

                                         JUL 3 1 2020

                                      CLERK US DISTRICT COURT
                                        DISTRICT OF NEVADA
                                    BY: _____ DEPUTY
```

1  DAVID L. JAFFE
   Chief, Organized Crime and Gang Section
2  United States Department of Justice
   KELLY PEARSON
3  Deputy Chief, Organized Crime and Gang Section
   CHAD W. MCHENRY
4  ALEXANDER GOTTFRIED
   Trial Attorneys, Organized Crime and Gang Section
5  501 Las Vegas Blvd. South, Suite 1100
   Las Vegas, Nevada 89101
6  (702) 388-6336
   Kelly.Pearson@usdoj.gov
7  Chad.W.McHenry@usdoj.gov
   Alexander.Gottfried@usdoj.gov
8
   *Representing the United States of America*
9

10              **UNITED STATES DISTRICT COURT**
11                  **DISTRICT OF NEVADA**

12  **United States of America**,

13              Plaintiff,                    Case No. 2:17-cr-306-JCM-PAL

14              v.                            **Plea Agreement Under Fed. R.
                                              Crim. P. 11(c)(1)(C)**
15  **Valerian Chiochiu**,

16              Defendant.

17

18        Plaintiff United States of America, by and through DAVID L. JAFFE, Chief

19  for the United States Department of Justice, Organized Crime and Gang Section,

20  KELLY PEARSON, Deputy Chief, Organized Crime and Gang Section, and CHAD

21  W. MCHENRY and ALEXANDER GOTTFRIED, Trial Attorneys, Organized Crime

22  and Gang Section, and the defendant, VALERIAN CHIOCHIU, and the defendant's

1  attorney, ALAN EISNER, ESQ., respectfully submit this Plea Agreement under Fed.

2  R. Crim. P. 11(c)(1)(C):

3  **I.      SCOPE OF AGREEMENT**

4       The parties to this Plea Agreement are the United States of America and

5  VALERIAN CHIOCHIU (the defendant). This Plea Agreement binds the defendant

6  and the United States Department of Justice's Organized Crime and Gang Section.

7       If the Court accepts this Plea Agreement, it will also bind the Court under

8  Fed. R. Crim. P.11(c)(1)(C).  It does not bind any other prosecuting, administrative,

9  or regulatory authority.

10       The Plea Agreement sets forth the parties' agreement regarding criminal

11  charges referenced in the Plea Agreement and applicable sentences, fines,

12  restitution, and forfeiture.

13  **II.     DISPOSITION OF CHARGES AND WAIVER OF TRIAL RIGHTS**

14       A.     <u>Guilty Plea</u>. The defendant knowingly and voluntarily agrees to plead

15  guilty to the following charge as set forth in the Second Superseding Criminal

16  Indictment returned by the grand jury on January 30, 2018, ECF No. 303:

17              COUNT ONE:   Conspiracy to Engage in a Racketeer Influenced

18              Corrupt Organization, in violation of 18 U.S.C. §§ 1962(d) and 1963.

19       The defendant also agrees to the imposition of the in personam criminal

20  forfeiture money judgment as set forth in the Plea Agreement, the Bill of Particulars,

21  and the Forfeiture Allegation of the Second Superseding Criminal Indictment.

22

2

VC

B.    <u>Waiver of Trial Rights</u>. The defendant acknowledges that he has been advised and understands that by entering a plea of guilty he is waiving – that is, giving up – certain rights guaranteed to all defendants by the laws and the Constitution of the United States. Specifically, the defendant is giving up:

1.    The right to proceed to trial by jury on all charges, or to a trial by a judge if the defendant and the United States both agree;

2.    The right to confront the witnesses against the defendant at such a trial, and to cross-examine them;

3.    The right to remain silent at such a trial, with assurance that his silence could not be used against him in any way;

4.    The right to testify in his own defense at such a trial if he so chooses;

5.    The right to compel witnesses to appear at such a trial and testify on the defendant's behalf; and

6.    The right to have the assistance of an attorney at all stages of such proceedings.

C.    <u>Withdrawal of Guilty Plea</u>. The defendant will not seek to withdraw his guilty plea after he has entered it in court unless the Court declines to accept the parties' binding agreement.  <u>See</u> Fed. R. Crim. P. 16(c)(5)(B).

D.    <u>Additional Charges</u>. The United States agrees not to bring any additional charges against the defendant arising out of the defendant's participation in conduct described in the agreed-upon factual basis for this Plea Agreement, to the

3

extent that the defendant has disclosed such participation to the Organized Crime and Gang Section of the United States Department of Justice (hereinafter collectively referred to as "this Office") as of the date of this Agreement, except that the United States reserves the right to prosecute the defendant for any criminal tax violations, including conspiracy to commit such violations, chargeable under 18 U.S.C. § 371.

## III.    ELEMENTS OF THE OFFENSE

COUNT ONE: The elements of Conspiracy to Engage in a Racketeer Influenced Corrupt Organization, in violation of 18 U.S.C. § 1962(d) are:

1.    First, that there was an agreement among two or more persons to participate in an enterprise that would affect interstate commerce through a pattern of racketeering activity;

2.    Second, that defendant knowingly and willfully became a member of that agreement; and

3.    Third, that the defendant or another member of the conspiracy agreed to commit two racketeering acts.

## IV.    FACTS SUPPORTING GUILTY PLEA

A.    The defendant will plead guilty because he is, in fact and under the law, guilty of the crimes charged.

B.    The defendant acknowledges that if he elected to go to trial instead of pleading guilty, the United States could prove his guilt beyond a reasonable doubt and by preponderance of the evidence establish its right to forfeit the specified

4

1   property.  The defendant further acknowledges that his admissions and declarations

2   of fact set forth below satisfy every element of the charged offenses.

3        C.      The defendant waives any potential future claim that the facts he

4   admitted in this Plea Agreement were insufficient to satisfy the elements of the

5   charged offense.

6        D.      The defendant understands, acknowledges, and agrees that the facts

7   set forth below are only those necessary to support a plea of guilty to the charge

8   described in this agreement and to establish the Sentencing Guidelines factors set

9   forth in Section VI below, and that they do not capture the entirety of his conduct,

10  criminal or otherwise, in this case. The defendant admits and declares under penalty

11  of perjury that the facts set forth below are true and correct:

12        1.      From on or about October 1, 2010, through on or about February

13  1, 2018, in the District of Nevada and elsewhere, defendant **CHIOCHIU** and his

14  codefendants, including others known and unknown, were members of, employed by,

15  and associated with the Infraud Organization described below, an enterprise

16  engaging in, and the activities of which affected interstate and foreign commerce,

17  and unlawfully and knowingly conducted and participated, directly and indirectly,

18  in the conduct of the affairs of the Infraud Organization through a pattern of

19  racketeering activity described below:

20        a.      The Infraud Organization was a criminal enterprise that

21  existed to enrich its members and associates through acts of identity theft and

22  financial fraud, including, but not limited to: acts involving trafficking in stolen

1   means of identification; trafficking in, producing, and using counterfeit identification

2   documents; identity theft; trafficking in, producing, and using unauthorized and

3   counterfeit access devices; bank fraud; and trafficking in the services associated with

4   the use of unauthorized counterfeit access devices; and which activities interfered

5   with interstate and foreign commerce. The Infraud Organization facilitated the sale

6   of contraband by its members, including counterfeit documents, stolen bank account

7   and credit account information, and stolen personal identifying information.

8   Members and associates of the Infraud Organization operated throughout the world

9   and the United States, to include Las Vegas, Nevada.

10              b.      From on or about October 1, 2010 to on or about February

11   6, 2018, the Infraud Organization was responsible for the sale and/or purchase of

12   over 4 million compromised credit and debit card numbers. The actual financial loss

13   associated with the Infraud Organization was in excess of $568 million USD. The

14   victims of the Infraud Organization include MasterCard, Visa, American Express,

15   and Discover Card corporations, in addition to countless financial institutions

16   located in the United States.

17              c.      The purposes of the Infraud Organization included: to

18   enrich its members and associates through the unlawful trafficking in means of

19   identification, document-making implements, counterfeit identification documents,

20   device-making equipment, and unauthorized and counterfeit access devices; to

21   establish the Infraud Organization as the premier online destination for the

22   purchase and sale of stolen property and other contraband, such as victims' personal

VC

and financial means of identification; to educate members in obtaining and using such property and contraband; to direct traffic, primarily through advertising and member feedback, to member owned and/or operated automated vending sites ("AVSes") and other websites to generate illicit proceeds, thereby promoting the Infraud Organization as the premier online source of reputable contraband vendors; to protect the Infraud Organization and its members from detection, apprehension, and prosecution by law enforcement; to preserve and protect Infraud operations and profits through the use of discipline, expulsion, and other acts of retribution; and to preserve and protect the reputation, operations, and profits of the enterprise through discipline, expulsion, and other acts of retribution against non-conforming members.

       d.    Members of the Infraud Organization trafficked in, produced, and transferred counterfeit identification documents; possessed document-making implements; transferred, possessed, and used means of identification of another person in the commission of and in connection with bank fraud affecting interstate and foreign commerce; possessed fifteen (15) or more counterfeit and unauthorized access devices affecting interstate and foreign commerce; trafficked in and possessed device-making equipment affecting interstate and foreign commerce; planned schemes to unlawfully obtain money and property from banks and other financial institutions by way of fraud and material misrepresentations and promises; and utilized the personal identifying information of victims in the forgery and false use of passports and other identification documents and authentication features.

7

1         e.     Members of the Infraud Organization used various means

2 to communicate, complete transactions, and establish connections, all of which were

3 designed to protect the membership's anonymity, evade detection and prosecution

4 by law enforcement, and provide security for the criminal organization against

5 attacks by other rival criminal organizations, including the use of: various website

6 forums controlled by the Infraud Organization, as online gathering places which

7 provided secure meeting locations for the members of the criminal enterprise;

8 private messaging, which is a non-forum wide message sent between individual

9 members on the criminal organization's website forums; e-mail, some of which are

10 encrypted and password protected, or use service providers located outside of the

11 United States; ICQ chat, which is a free instant messaging electronic communication

12 service; proxies, which are achieved by bouncing from one computer to another to

13 hide a member's true originating IP address; Virtual Private Networks, which are

14 similar to proxies, but with the addition of creating an encrypted to prevent the

15 communications within that tunnel from being intercepted and monitored; and

16 protected drop sites in the United States and elsewhere, in the event that there was

17 a need to transport, transfer, and receive physical contraband.

18         f.     Members of the Infraud Organization have defined roles

19 in the enterprise, including Administrator, Moderator, Reviewers, Vendors, and

20 Members.

21         i.     The Administrators of the Infraud Organization

22 were individuals that served as a governing council for the Infraud Organization

8

who, collectively, controlled the destiny of the organization.  The Administrator(s) initially seeded the Infraud Organization forum with "reputable" vendors of contraband in order to attract traffic and membership and grow the organization. They handled the day-to-day management decisions of the Infraud Organization, as well as long term strategic planning for its continued viability.  They determined which individuals were permitted to become and remain members of the Infraud Organization; the functions, responsibilities and levels of access to information for all members of the organization; and the rewards accorded to members for their loyalty to the organization as well as the punishments meted out to members evidencing disloyalty to the organization. Furthermore, they decided when, how and under what circumstances to attack and retaliate against members of rival criminal organizations and their associated internet websites.  The Administrator(s) were accorded full access to, and privileges on, the computer servers that hosted the Infraud Organization's websites, and, thus, had the ultimate responsibility for the physical administration, maintenance, and security of those servers and websites.

ii.   Super Moderators oversaw and administered one or-more subject-matter specific areas on the Infraud Organization's forum that either fell within an area of their expertise or covered their geographic location, limiting their activities to editing and deleting posts by members on these forums and mediating disputes.  Super Moderators frequently served as reviewers for particular products or services with which they had an expertise.

        iii.    Moderators, like Super Moderators, oversaw and administered one or more subject-matter specific areas on the Infraud Organization's forum that either fell within an area of their expertise or covered their geographic location.  However, Moderators tended to be more limited in the authority they were granted, and were generally limited to moderating one or two specific sub-forums.

        iv.     Vendors sold illicit products and services to members of the Infraud Organization. These sales could occur through the vendor's own website to which would-be purchasers were directed by the advertisements they paid for and placed on the Infraud Organization's web forum.  Such sales could also occur directly between the vendor and customer, *i.e.* via email, private message, or ICQ chat. Products sold by vendors were reviewed on the forum by Infraud members to ensure that vendors of low-quality goods did not remain in business with the Infraud Organization.  This helped cement the organization's reputation as a premiere online destination for safe, high-quality, and readily available fraud-related contraband.

        v.      VIP Members were some of the premiere members of the Infraud Organization. The leaders of the organization bestowed this title upon longstanding or otherwise notable members in order to distinguish them from the general membership and from vendors.

        vi.     Members of the Infraud Organization typically used the organization's websites to gather and provide information about

1    perpetuating criminal activity; to share information with and solicit other members

2    to engage in their criminal schemes; to use the website's vendor to facilitate their

3    unlawful purchases of credit card dumps, false identification documents, and other

4    contraband; and to have their individual disputes with other organization members

5    settled by the Administrators or Moderators.

6              g.    On or about December 19, 2012, defendant **CHIOCHIU**

7    joined the Infraud Organization using the nic "Onassis." **CHIOCHIU** advised other

8    members of the Infraud Organization on the creation and use of malicious computer

9    software, commonly referred to as "malware," that may be used to surreptitiously

10   exfiltrate sensitive data from infected computers. In addition to these discussions,

11   **CHIOCHIU** authored a strain of malware dubbed "FastPOS" by the computer

12   security community. **CHIOCHIU** facilitated the use by Infraud Organization

13   members, and others, of that malware, and of other unlawful means, to harvest and

14   take without the true owners' permission credit card account numbers and other

15   access device data. **CHIOCHIU** knew that said unlawfully obtained data would then

16   be sold to Infraud Organization members, and others, through the use of automated

17   vending sites and direct correspondence with individual customers. Using the

18   proceeds of this facilitation, **CHIOCHIU** also fraudulently purchased gift cards,

19   which he was then able to convert to monetary proceeds through the use of an online

20   gift card selling platform, obtaining in excess of $1 million USD in this fashion.

21              i.    During the course of this activity, in the Federal

22   District of Nevada and elsewhere, and in furtherance of the Infraud Organization's

1   criminal enterprise, defendant **CHIOCHIU**, on multiple occasions: a) knowingly and

2   with the intent to defraud, produced, used, or trafficked in one or more counterfeit

3   access devices; b) knowingly and with the intent to defraud, trafficked in or used one

4   or more unauthorized access devices during any one-year period and by such conduct

5   obtained anything of value aggregating $1,000 or more during that period; c)

6   knowingly and with intent to defraud, possessed fifteen (15) or more counterfeit or

7   unauthorized access devices; and d) without the authorization of the issuer of the

8   access device, knowingly and with the intent to defraud, solicited persons for the

9   purposes of offering an access device or selling information regarding or an

10  application to obtain an access device.

11          h.      On March 28, 2017, **CHIOCHIU** surrendered himself to

12  the government, by earlier agreement, on the arrest warrant that was issued

13  pursuant to the Indictment in the above-captioned case. As a part of that agreement,

14  he brought with him and provided the government two computer hard drives and

15  one iPhone that had been used to commit the crimes with which he was charged.

16  However, the night before he turned himself in, he factory reset the iPhone and used

17  counter-forensic software called "CCleaner" to surgically wipe the hard drives,

18  destroying substantial amounts of digital evidence pertaining to his criminal

19  conduct, and rendering any such deleted data incapable of forensic recovery.

20  **CHIOCHIU** left intact a large amount of innocuous data on both drives, such as

21  family photographs, various software applications and operating system data, and

22  personal documents, in an attempt to mask his targeted destruction of evidence.

1        i.      As part of the conspiracy, defendant **CHIOCHIU** agreed

2   that he or a co-conspirator would engage in two or more racketeering acts, including

3   violations of 18 U.S.C. § 1028(a)(1) (Trafficking in and Production of False

4   Identification Documents); 18 U.S.C. § 1028(a)(5) (Unlawful Possession of an

5   Authentication Feature); 18 U.S.C. § 1028(a)(7) (Unlawful Transfer, Possession or

6   Use of a Means of Identification for an Unlawful Activity); 18 U.S.C. § 1029(a)(3)

7   (Possession of 15 or More Unauthorized Access Devices); 18 U.S.C. § 1029(a)(4)

8   (Trafficking in and Possession of Access Device-Making Equipment); 18 U.S.C. §

9   1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); and 18 U.S.C. § 1543 (Forgery

10  and False Use of a Passport).

11       2.      Defendant **CHIOCHIU** expressly admits that: 1) a loss amount

12  of $568,000,000.00 USD is attributable to the defendant for conspiring with

13  members of the enterprise; 2) the offense, Conspiracy to Engage in a Racketeer

14  Influenced Corrupt Organization, involved more than 10 victims; 3) a substantial

15  part of the offense of Conspiracy to Engage in a Racketeer Influenced Corrupt

16  Organization was conducted overseas and otherwise used sophisticated means; and

17  4) the offense, Conspiracy to Engage in a Racketeer Influenced Corrupt

18  Organization, involved possession and use of device-making equipment, and the

19  production of and trafficking in unauthorized and counterfeit access devices.

20       3.      The defendant admits the in personam criminal forfeiture money

21  judgment amount listed in Section X is (1) any interest acquired or maintained in

22  violation of Title 18, United States Code, Section 1962; (2) any interest in; security

1  of; claim against; or property or contractual right of any kind affording a source of

2  influence over; any enterprise established, operated, controlled, conducted, or

3  participated in the conduct of, in violation of Title 18, United States Code, Section

4  1962; (3) any property constituting, or derived from, any proceeds obtained, directly

5  or indirectly, from racketeering activity in violation of Title 18, United States Code,

6  Section 1962; (4) any personal property used or intended to be used to commit the

7  violations of Title 18, United States Code, Section 1028; (5) any personal property

8  used or intended to be used to commit the violations of Title 18, United States Code,

9  Section 1029; (6) any property, real or personal, which constitutes or is derived from

10 proceeds traceable to violations of Title 18, United States Code, Sections 1028, 1029,

11 1343, 1344, and 1543, specified unlawful activities as defined in Title 18, United

12 States Code, Sections 1956(c)(7)(A) and 1961(1)(B), or Title 18, United States Code,

13 Section 1962(c) and (d), conspiracy to commit such offenses; (7) any property

14 constituting, or derived from, proceeds obtained directly or indirectly, as the result

15 of violations of Title 18, United States Code, Sections 1343 and 1344, affecting a

16 financial institution, or Title 18, United States Code, Section 1962(c) and (d),

17 conspiracy to violate such offenses; (8) any property constituting, or derived from,

18 proceeds obtained directly or indirectly, as the result of violations of Title 18, United

19 States Code, Sections 1028 and 1029, or Title 18, United States Code, Section 1962(c)

20 and (d), conspiracy to violate such offenses; (9) any property real or personal that

21 constitutes, or is derived from or is traceable to the proceeds obtained directly or

22 indirectly from the commission of Title 18, United States Code, Sections 1028 and

14

1   1543, or Title 18, United States Code, Section 1962(c) and (d), conspiracy to violate

2   such offenses; and (10) any property real or personal that is used to facilitate, or is

3   intended to be used to facilitate, the commission of Title 18, United States Code,

4   Sections 1028 and 1543, or Title 18, United States Code, Section 1962(c) and (d),

5   conspiracy to violate such offenses, and is subject to forfeiture pursuant to Title 18,

6   United States Code, Section 1963(a)(1), (a)(2), and (a)(3); Title 18, United States

7   Code, Section 1028(b)(5), (g), and (h); Title 18, United States Code, Section

8   1029(c)(1)(C) and 1029(c)(2); Title 18, United States Code, Section 981(a)(1)(C) with

9   Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section

10  982(a)(2)(A); Title 18, United States Code, Section 982(a)(2)(B); Title 18, United

11  States Code, Section 982(a)(6)(A)(ii)(I) with 982(a)(6)(B); Title 18, United States

12  Code, Section 982(a)(6)(A)(ii)(II) with 982(a)(6)(B); and Title 18, United States Code,

13  Section 1963(m).

14          4.      Defendant **CHIOCHIU** further expressly admits that the acts

15  set forth above, among others: were knowingly and voluntarily committed in

16  furtherance of the Infraud Organization's criminal enterprise; constitute a pattern

17  of racketeering activity; were committed in and affecting interstate and foreign

18  commerce; and were done for the gain of the Infraud members, the benefit of others,

19  and in furtherance of the Infraud criminal enterprise.

20  **V.    COLLATERAL USE OF FACTUAL ADMISSIONS**

21          The facts set forth in Section IV of this Plea Agreement shall be admissible

22  against the defendant under Fed. R. Evid. 801(d)(2)(A) at sentencing for any

1   purpose.  If the defendant does not plead guilty or withdraws his guilty plea, the

2   facts set forth in Section IV of this Plea Agreement shall be admissible at any

3   proceeding, including a trial, for impeaching or for rebutting any evidence,

4   argument, or representation offered by or on the defendant's behalf.  The defendant

5   expressly waives all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410

6   regarding the use of the facts set forth in Section IV of this Plea Agreement.

7   **VI.   APPLICATION   OF   SENTENCING   GUIDELINES   (U.S.S.G.)
        PROVISIONS**

8
        A.   Count One: Conspiracy to Engage in a Racketeer Influenced Corrupt
9            Organization

10            1.   Base Offense Level [U.S.S.G. § 2B1.1(a)(1)]:          7

11        2.   Specific Offense Characteristics:

12            More than $550,000,000
              in loss [U.S.S.G § 2B1.1(b)(1)(P)]:                   +30
13
              Offense involves more than 10 victims
14            [U.S.S.G. § 2B1.1(b)(2)(A)]:                          +2

15            Substantial part of offense conducted
              overseas and otherwise used sophisticated
16            means [U.S.S.G. § 2B1.1(b)(10)]:                      +2

17            Offense involved possession and use of
              device-making equipment, and production
18            and trafficking of unauthorized and counterfeit
              access devices [U.S.S.G. §§ 2B1.1(b)(11)(A), (B)]:   +2
19
        3.   Adjusted Offense Level:                               **43**
20
            The defendant acknowledges that the statutory maximum sentence
21
   and any statutory minimum sentence limit the Court's discretion in determining the
22
   defendant's sentence notwithstanding any applicable Sentencing Guidelines

1    provisions. The defendant understands that although the United States agrees

2    recommend a prison sentence of no greater than eleven (11) years, the Court may

3    defer a decision whether to accept or reject the Plea Agreement until the Court has

4    reviewed the presentence report, in which the United States Probation Office will

5    independently calculate the defendant's offense level under the Sentencing

6    Guidelines.

7        B.   Reduction of Offense Level for Acceptance of Responsibility. Under

8    U.S.S.G. § 3E1.1(a), the United States will recommend that the defendant receive a

9    two-level downward adjustment for acceptance of responsibility unless he: (a) fails

10   to truthfully admit facts establishing a factual basis for the guilty plea when he

11   enters the plea; (b) fails to truthfully admit facts establishing the amount of

12   restitution owed when he enters his guilty plea; (c) fails to truthfully admit facts

13   establishing the forfeiture allegations when he enters his guilty plea; (d) provides

14   false or misleading information to the United States, the Court, Pretrial Services, or

15   the Probation Office; (e) denies involvement in the offense or provides conflicting

16   statements regarding his involvement or falsely denies or frivolously contests

17   conduct relevant to the offense; (f) attempts to withdraw his guilty plea; (g) commits

18   or attempts to commit any crime; (h) fails to appear in court; (i) violates his

19   conditions of pretrial release; or (j) commits any act which could result in the United

20   States seeking an obstruction of justice enhancement within the meaning of U.S.S.G.

21   § 3C1.1.

22

17

VC

1    Under U.S.S.G. § 3E1.1(b), if the Court determines that the Defendant's total

2 offense level, before operation of § 3E1.1(a), is 16 or higher, and if the United States

3 recommends a two-level downward adjustment pursuant to the preceding

4 paragraph, the United States will move for an additional one-level downward

5 adjustment for acceptance of responsibility before sentencing   because the

6 defendant communicated his decision to plead guilty in a timely manner that

7 enabled the United States to avoid preparing for trial and to efficiently allocate its

8 resources.

9    C.  Criminal History Category. The defendant acknowledges that the

10 Court may base his sentence in part on the defendant's criminal record or criminal

11 history. The Court will determine the defendant's Criminal History Category under

12 the Sentencing Guidelines, and the Criminal History Category could result in an

13 increase in the advisory guideline range.

14    D.  Relevant Conduct. The Court may consider any counts dismissed

15 under this Plea Agreement and all other relevant conduct, whether charged or

16 uncharged, in determining the applicable Sentencing Guidelines range and whether

17 to depart from that range.

18    E.  Additional Sentencing Information. The stipulated Sentencing

19 Guidelines calculations are based on information now known to the parties. The

20 parties may provide additional information to the United States Probation Office

21 and the Court regarding the nature, scope, and extent of the defendant's criminal

22 conduct and any aggravating or mitigating facts or circumstances. Good faith efforts

JC

1  to provide truthful information or to correct factual misstatements shall not be
2  grounds for the defendant to withdraw his guilty plea.

3       The defendant acknowledges that the United States Probation Office may
4  calculate the Sentencing Guidelines differently and may rely on additional
5  information it obtains through its investigation.  The defendant also acknowledges
6  that the Court may rely on this and other additional information as it calculates the
7  Sentencing Guidelines range and makes other sentencing determinations, and the
8  Court's reliance on such information shall not be grounds for the defendant to
9  withdraw his guilty plea.

10 **VII.   APPLICATION OF SENTENCING STATUTES**

11      A.   <u>Maximum Penalty</u>.

12           <u>Count One.</u> The maximum penalty for Conspiracy to Engage in a
13 Racketeer Influenced Corrupt Organization, in violation of 18 U.S.C. §§ 1962(d) and
14 1963, is not more than twenty (20) years in prison, a fine of not more than two
15 hundred and fifty thousand dollars ($250,000), or both a fine and imprisonment.

16      B.   <u>Factors Under 18 U.S.C. § 3553</u>. The Court must consider the factors
17 set forth in 18 U.S.C. § 3553(a) in determining the defendant's sentence. However,
18 the statutory maximum sentence and any statutory minimum sentence limit the
19 Court's discretion in determining the defendant's sentence.

20      C.   <u>Parole Abolished</u>. The defendant acknowledges that his prison sentence
21 cannot be shortened by early release on parole because parole has been abolished.

22

1    D.  <u>Supervised Release</u>. In addition to imprisonment and a fine, the

2 defendant will be subject to a term of supervised release not to exceed three (3) years

3 as to Count One.  Supervised release is a period of time after release from prison

4 during which the defendant will be subject to various restrictions and requirements.

5 If the defendant violates any condition of supervised release, the Court may order

6 the defendant's return to prison for all or part of the term of supervised release,

7 which could result in the defendant serving a total term of imprisonment greater

8 than the statutory maximum prison sentence.

9    E.  <u>Special Assessment</u>. The defendant will pay a one-hundred dollar

10 ($100.00) special assessment per count of conviction at the time of sentencing.

11    F.  <u>Additional Costs</u>. The defendant is required to pay for the costs of

12 imprisonment, probation, and supervised release, including the costs for electronic

13 monitoring of home detention, unless the defendant establishes that the defendant

14 does not have the ability to pay such costs, in which case the Court may impose an

15 alternative sanction such as community service.

16 **VIII. POSITIONS REGARDING SENTENCE**

17    This Plea Agreement is governed, in part, by Federal Rule of Criminal

18 Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed

19 by the Court shall include a term of imprisonment of not more than 11 years (132

20 months) in the custody of the Bureau of Prisons. Because this plea is offered pursuant

21 to Federal Rule of Criminal Procedure 11(c)(1)(C), if the Court accepts the plea

22

1 agreement, the Court may not impose a greater sentence than that agreed by the

2 parties in this plea agreement.

3       The Court may accept this agreement, reject it, or defer a decision until the

4 Court has reviewed the presentence report.  If the Court accepts and agrees to not

5 impose a sentence of greater than 11 years' (132 months') imprisonment, defendant may

6 not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure

7 11(d). If, however, the Court rejects the Plea Agreement, or otherwise refuses to accept

8 defendant's plea of guilty, either party shall have the right to withdraw from this Plea

9 Agreement. The Court will advise the defendant that if the Court rejects the guilty

10 plea, and his plea of guilty is not withdrawn, the disposition of the case may be less

11 favorable than that contemplated by this plea agreement.

12       The defendant is free to seek any downward departure, adjustment, or

13 variance pursuant to 18 U.S.C. § 3553 or U.S.S.G. § 4A1.3(b)(1), and the United

14 States is free to oppose any departures, adjustments, or variances. The defendant

15 acknowledges that the Court does not have to follow the recommendation of either

16 party.

17 **IX.**   **RESTITUTION**

18       The defendant and the government agree, and request that the Court find on

19 the record, that the number of victims in this case is so large as to make restitution

20 impracticable. *See* 18 U.S.C. § 3663A(c)(3)(A). Moreover, the defendant and the

21 government agree, and request that the Court find on the record, that determining

22 complex issues of fact related to the cause or the amount of those victims' losses

1    would complicate or prolong the sentencing process to a degree that the need to

2    provide restitution to any victim is outweighed by the burden of the sentencing

3    process. *See* 18 U.S.C. § 3663A(c)(3)(B).

4          Therefore, the defendant and government agree that the Court should order

5    in lieu of restitution a fine in the amount of $568,000,000 pursuant to 18 U.S.C.

6    § 3571(d). Any payments made by the defendant toward the amount of this fine shall

7    be deposited into the Crime Victims Fund pursuant to 34 U.S.C. § 20101.

8          The defendant understands, acknowledges and agrees that he cannot

9    discharge this fine obligation through bankruptcy proceedings.   The defendant

10   further understands, acknowledges and agrees that fine payments and obligations

11   cannot offset or reduce the amount of any forfeiture judgment imposed in this case.

12   **X.     FORFEITURE**

13         The defendant knowingly and voluntarily:

14   A. Agrees to the District Court imposing an in personam criminal forfeiture

15   money judgment of $1,548,568.77;

16         B.     Agrees the in personam criminal forfeiture money judgment amount

17   complies with *Honeycutt v. United States*, ___U.S.___, 137 S. Ct. 1626 (2017);

18         C.     Waives his right to any abandonment proceedings, any civil

19   administrative forfeiture proceedings, any civil judicial forfeiture proceedings, or

20   any criminal forfeiture proceedings of the in personam criminal forfeiture money

21   judgment (proceedings);

22

VC

1    D.    Waives service of process of any and all documents filed in this action

2  or any proceedings concerning the in personam criminal forfeiture money judgment

3  arising from the facts and circumstances of this case;

4    E.    Agrees not to file any claim, answer, petition, or other documents in

5  any proceedings concerning the in personam criminal forfeiture money judgment;

6    F.    Waives the statute of limitations, the CAFRA requirements, Fed. R.

7  Crim. P. 7, 11, and 32.2, all constitutional requirements, including, but not limited

8  to, the constitutional due process requirements of any proceedings concerning the in

9  personam criminal forfeiture money judgment;

10    G.    Waives all constitutional, legal, and equitable defenses to the in

11  personam criminal forfeiture money judgment in any proceedings, including, but not

12  limited to, (1) constitutional or statutory double jeopardy defenses and (2) defenses

13  under the Excessive Fines or Cruel and Unusual Punishments Clauses of the Eighth

14  Amendment to the United States Constitution;

15    H.    Agrees to the entry of an Order of Forfeiture for the in personam

16  criminal forfeiture money judgment to the United States;

17    I.    Waives the right to appeal any Order of Forfeiture;

18    J.    Agrees the in personam criminal forfeiture money judgment is

19  immediately due and payable and is subject to immediate collection by the United

20  States;

21    K.    Agrees and understands the in personam criminal forfeiture money

22  judgment shall not be treated as satisfaction of any assessment, fine, restitution,

23

1  cost of imprisonment, or any other penalty the Court may impose upon the defendant

2  in addition to the forfeiture;

3       L.   Acknowledges that the amount of the forfeiture may differ from, and

4  may be significantly greater than or less than, the amount of restitution; and

5       M.   Agrees to take all steps as requested by the United States to pass clear

6  title of any forfeitable assets that may be used to satisfy the in personam criminal

7  forfeiture money judgment to the United States and to testify truthfully in any

8  judicial forfeiture proceedings. The defendant understands and agrees that the in

9  personam criminal forfeiture money judgment amount represents proceeds and/or

10  facilitating property of illegal conduct and is forfeitable. The defendant

11  acknowledges that failing to cooperate in full in the disclosure of assets constitutes

12  a breach of this Plea Agreement.

13  **XI.   FINANCIAL INFORMATION AND DISPOSITION OF ASSETS**

14       Before or after sentencing, upon request by the Court, the United States, or

15  the Probation Office, the defendant will provide accurate and complete financial

16  information, submit sworn statements, and/or give depositions under oath

17  concerning his assets and his ability to pay. The defendant will surrender assets he

18  obtained directly or indirectly as a result of his crimes, and will release funds and

19  property under his control in order to pay any fine, forfeiture, or restitution ordered

20  by the Court.

21  **XII.   THE DEFENDANT'S ACKNOWLEDGMENTS AND WAIVERS**

22       A.   <u>Plea Agreement and Decision to Plead Guilty</u>. The defendant

24

acknowledges that:

1. He has read this Plea Agreement and understands its terms and conditions;

2. He has had adequate time to discuss this case, the evidence, and this Plea Agreement with his attorney;

3. He has discussed the terms of this Plea Agreement with his attorney;

4. The representations contained in this Plea Agreement are true and correct, including the facts set forth in Section IV; and

5. He was not under the influence of any alcohol, drug, or medicine that would impair his ability to understand the Agreement when he considered signing this Plea Agreement and when he signed it.

The defendant understands that he alone decides whether to plead guilty or go to trial, and acknowledges that he has decided to enter his guilty plea knowing of the charges brought against him, his possible defenses, and the benefits and possible detriments of proceeding to trial. The defendant also acknowledges that he decided to plead guilty voluntarily and that no one coerced or threatened him to enter into this Plea Agreement.

B. <u>Waiver of Appeal and Post-Conviction Proceedings</u>. The defendant knowingly and expressly waives: (a) the right to appeal any sentence imposed within or below the applicable Sentencing Guideline range as determined by the Court; (b) the right to appeal the manner in which the Court determined that sentence on

1  the grounds set forth in 18 U.S.C. § 3742; and (c) the right to appeal any other aspect

2  of the conviction or sentence and any order of restitution or forfeiture.

3  The defendant also knowingly and expressly waives all collateral challenges,

4  including any claims under 28 U.S.C. § 2255, to his conviction, sentence, and the

5  procedure by which the Court adjudicated guilt and imposed sentence, except non-

6  waivable claims of ineffective assistance of counsel.

7  The defendant reserves only the right to appeal any portion of the sentence

8  that is an upward departure from the sentencing guideline range determined by the

9  Court.

10  The defendant acknowledges that the United States is not obligated or

11  required to preserve any evidence obtained in the investigation of this case.

12  C.  <u>Removal/Deportation Consequences.</u>  The defendant understands and

13  acknowledges that if he is not a United States citizen, then it is highly probable that

14  he will be permanently removed (deported) from the United States as a consequence

15  of pleading guilty under the terms of this Plea Agreement.  The defendant has also

16  been advised if his conviction is for an offense described in 8 U.S.C. § 1101(a)(43), he

17  will be deported and removed from the United States and will not be allowed to

18  return to the United States at any time in the future.  The defendant desires to plead

19  guilty regardless of any immigration consequences that may result from his guilty

20  plea, even if the consequence is automatic removal from the United States with no

21  possibility of returning.  The defendant acknowledges that he has specifically

22  discussed these removal/deportation consequences with his attorney.

26

# XIII.  ADDITIONAL ACKNOWLEDGMENTS

This Plea Agreement resulted from an arms-length negotiation in which both parties bargained for and received valuable benefits in exchange for valuable concessions.  It constitutes the entire agreement negotiated and agreed to by the parties.  No promises, agreements or conditions other than those set forth in this agreement have been made or implied by the defendant, the defendant's attorney, or the United States, and no additional promises, agreements or conditions shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the record before the Court.

DAVID L. JAFFE
Chief, Organized Crime and Gang Section
United States Department of Justice

DATE: 7/27/2020     /s/ Chad McHenry

KELLY PEARSON
Deputy Chief, Organized Crime and Gang Section

CHAD W. MCHENRY
ALEXANDER GOTTFRIED
Trial Attorneys

DATE: 5/29/2020     Chiochiu

VALERIAN CHIOCHIU
Defendant

DATE: 7/27/2020

ALAN EISNER, ESQ.
Counsel for Defendant CHIOCHIU

27

1    CERTIFICATION OF INTERPRETER

2    I, ADRIANA CHIRILOV, a California State Certified Interpreter/translator, am

3    fluent in the writing and spoken English and Romanian languages.  I accurately

4    translated this entire agreement from English into Romanian to defendant

5    VALERIAN CHIOCHIU on July 28, 2020.

6

7    Dated:  July 29, 2020                          *AChirilov*
                                                    SIGNATURE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**XIII.  ADDITIONAL ACKNOWLEDGMENTS**

This Plea Agreement resulted from an arms-length negotiation in which both parties bargained for and received valuable benefits in exchange for valuable concessions.  It constitutes the entire agreement negotiated and agreed to by the parties.  No promises, agreements or conditions other than those set forth in this agreement have been made or implied by the defendant, the defendant's attorney, or the United States, and no additional promises, agreements or conditions shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the record before the Court.


DAVID L. JAFFE
Chief, Organized Crime and Gang Section
United States Department of Justice


DATE: _____     _____
KELLY PEARSON
Deputy Chief, Organized Crime and Gang Section

CHAD W. MCHENRY
ALEXANDER GOTTFRIED
Trial Attorneys


DATE: _____     _____
VALERIAN CHIOCHIU
Defendant

DATE: July 28, 2020     _____
ALAN EISNER, ESQ.
Counsel for Defendant CHIOCHIU

I, Adriana Chiriła, fluent in Spanish and Romanian languages, I accurately translated/interpreted this entire document (consisting of 29 pages, from English into romanian, to defendant Valerian Chiochiu in this date (July 27, 2020)
Adriana Chiriła